THE HONORABLE JOHN C. COUGHENOUR

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

| | |
|---|---|
| A PLACE FOR MOM, | CASE NO. C20-1028-JCC |
| Plaintiff, | ORDER |
| v. | |
| LISA PERKINS, | |
| Defendant. | |

This matter comes before the Court on Plaintiff's motion for a preliminary injunction (Dkt. No. 11) and motions to seal (Dkt. Nos. 14, 48). Having thoroughly considered the parties' briefing and the relevant record, the Court finds oral argument unnecessary and hereby GRANTS the motion for the reasons explained herein.

## I.   BACKGROUND

Plaintiff is a Delaware corporation, headquartered in New York, that provides referrals to individuals for senior living and care facilities. (Dkt. No. 1-5 at 3.) Plaintiff is the "largest senior living and care referral service company" in North America. (*Id.*) Its network includes over 17,000 providers of senior living and care services. (*Id.*) If a customer chooses to reside at a senior living and care facility in Plaintiff's network following a referral by Plaintiff, that facility pays Plaintiff. (*Id.*)

Defendant is a former employee of Plaintiff and a resident of Texas. (*Id.*) Plaintiff hired

Defendant in June 2015. (*Id.* at 4.) On June 19, 2015, Defendant signed an employment agreement that included a confidentiality clause, a non-solicitation clause, and a non-competition clause. (*Id.* at 4–5.) In relevant part, Defendant's employment agreement stated the following:

> **Confidentiality Obligation**. "I understand and agree that all Proprietary Information . . . is the Company's sole property, including all trade secrets, patents, copyrights and other rights in connection therewith . . . . I will not use any Proprietary Information disclosed to me for my own use or for any purpose other than to carry out my Duties . . . . Except as expressly provided in this Agreement, I will not (a) publish or disclose any Proprietary Information, (b) use any Proprietary Information for any purpose including, but not limited to, selling, licensing, marketing, or otherwise distributing any Proprietary Information and (c) use any Proprietary Information in any way detrimental to the Company and its business interests. Upon termination of the Employment Period, or upon the Company's earlier request, I will return or deliver to the Company all tangible forms of such Proprietary Information, and any other Company property in my possession or control, including but not limited to drawings, specifications, documents, records, devices, or any other original or copied material. I will not retain any copies, summaries, or notes of Proprietary Information unless expressly approved in writing by the President of the Company.
>
> . . .
>
> **Solicitation of Employees and Company Customers**. Except when I am acting for the Company's benefit, during the Employment Period, and for 12 months after my employment terminates for any reason, I will not solicit, contact, call upon, or attempt to solicit any employees or Company Customers, for the purposes of providing any products or services that may be used as a substitute for the products or services I provided while employed with the Company. This restriction applies only to any employees or Company Customers with whom I had contact or about whom I learned Proprietary Information during the last 24 months of my employment with Company. For purposes of this paragraph, "contact" means interaction between me and the employees of Company Customers which takes place to further the business relationship, or making sales to or performing services for the Company Customers.
>
> . . .
>
> **Noncompetition**. During my Employment Period with the Company and for 12 months after my employment terminates for any reason, I will not, without the Company's prior written consent, directly or indirectly work on any products or services that could be used as a substitute for any product or services being commercially developed or exploited by the Company during the last 24 months of

my employment with the Company and either (a) about which I learned Proprietary Information or (b) on which I worked.

(*Id.* at 4–5.)

While working for Plaintiff, Defendant was responsible for "establishing, fostering, and maintaining relationships with [Plaintiff's] customers and referral sources in Texas, including hospitals, rehabilitation centers, and other healthcare providers." (*Id.* at 4.) On April 17, 2020, Defendant voluntarily resigned from her employment with Plaintiff. (Dkt. No. 24 at 9.) When she resigned, Defendant allegedly told Plaintiff that she was leaving to care for her aging mother. (Dkt. No. 1-5 at 6.) Plaintiff claims it was not aware that Defendant was in fact going to work for another company. (*Id.*) Sometime between April and June 2020, Plaintiff learned that Defendant had accepted new employment with Senior Living Specialists, LLC, which is headquartered in Addison, Texas. (*Id.*) Plaintiff claims that Defendant's new employer is Plaintiff's direct competitor in the senior living and care referral services in Texas. (*Id.*)

After learning that Defendant was working for a direct competitor, Plaintiff allegedly reviewed Defendant's company email and discovered that in the six weeks preceding her resignation, Defendant sent "highly-sensitive company records and trade secrets regarding [Plaintiff's] customers, referral sources, training materials, and sales and marketing strategies" to her personal email account. (Dkt. No. 11 at 2.) Defendant asserts that she emailed herself reports containing "non-proprietary and non-confidential information to verify whether [Plaintiff] had paid her all wages owed due to an ongoing dispute about [Plaintiff's] payment of commissions." (Dkt. No. 24 at 3.)

At the heart of this case is Plaintiff's allegation that Defendant is "using [Plaintiff's] confidential, proprietary, and trade secret information for her own benefit and for the benefit of her new employer." (Dkt. No. 1-5 at 6.) Plaintiff further alleges that Defendant is "soliciting [Plaintiff's] referral sources for her own benefit and for the benefit of her new employer." (*Id.*) As an apparent result of Defendant's solicitation, "at least one referral source has informed [Plaintiff] that it will be working with [Defendant] now instead of [Plaintiff]." (*Id.*) Plaintiff thus

claims that Defendant's actions "interfere with [Plaintiff's] customer and referral relationships, irreparably harm and damage [Plaintiff's] business, jeopardize [Plaintiff's] confidential information and trade secrets, and put [Plaintiff] at a competitive disadvantage." (Dkt. No. 11 at 2.)

On June 16, 2020, Plaintiff filed a complaint for injunctive relief and damages in King County Superior Court. (Dkt. Nos. 1 at 2, 1-5 at 1.) On June 24, 2020, Plaintiff moved for a temporary restraining order, an order to show cause, and an order for expedited discovery. (*Id.*) On June 29, 2020, the parties participated in a temporary restraining order hearing before Court Commissioner Hendry H. Judson. (*Id.*) After considering the parties' pleadings and hearing oral argument, the Superior Court found that Plaintiff had submitted sufficient evidence to demonstrate a likelihood that it will prevail on the merits of its claims. (Dkt. No. 1-2 at 4.) The Superior Court further found that Plaintiff would suffer actual and substantial injury if Defendant was not immediately enjoined pending further proceedings. (*Id.*) The Superior Court accordingly entered a temporary restraining order and scheduled a hearing to show cause for a preliminary injunction for July 17, 2020.[1] (Dkt. No. 1 at 2.)

Defendant removed the case on July 1, 2020, (Dkt. No. 1 at 1), and filed her answer on July 8, 2020, (Dkt. No. 10). On July 9, 2020, Plaintiff filed the instant motion for a preliminary injunction. (Dkt. No. 11.) On July 24, 2020, Defendant filed a response, (Dkt. No. 31), and sent Plaintiff her discovery responses, (*see* Dkt. Nos. 45 at 2–4; 49-1; 49-3; 49-4; 49-5; 50; 51). Defendant's responses revealed several pertinent facts, including that Defendant (1) accessed Plaintiff's Salesforce database "eleven times after she left" her position with Plaintiff, (Dkt. No. 46 at 2); (2) forwarded one of Plaintiff's lead sourcing reports "containing extensive information about [Plaintiff's] referral sources, customers, and marketing efforts" to her new employer on

---

[1] On July 13, 2020, Plaintiff filed a motion to extend the Superior Court's temporary restraining order pending the Court's order on Plaintiff's motion for a preliminary injunction. (Dkt. No. 25.) On July 17, 2020, the Court granted Plaintiff's motion and extended the temporary restraining order to July 31, 2020. (Dkt. No. 29.)

ORDER
C20-1028-JCC
PAGE - 4

June 19, 2020, after being served with a copy of the summons and complaint in this action, (Dkt. Nos. 45 at 2; 50 at 2); (3) "contacted twenty or more" of Plaintiff's referral sources since ending her employment, (Dkt. No. 49-1 at 5); (4) communicated with "at least one" of Plaintiff's employees about leaving Plaintiff's organization and joining Senior Living Services, (Dkt. No. 49-3); and (5) "stole hard copy documents and copied documents to a jump drive," (*id.* at 6).

## II.    DISCUSSION

### A.    Plaintiff's Motion for Preliminary Injunction

Federal law provides the rules for modifying a preliminary injunction entered by a state court prior to removal. *See Granny Goose Foods, Inc. v. Brotherhood of Teamsters & Auto Truck Drivers Loc. No. 70*, 415 U.S. 423, 437 (1974); *Pantoja v. Countrywide Home Loans, Inc.*, 640 F. Supp. 2d 1177, 1183 n.5 (N.D. Cal. 2009). Those rules give a district court "wide discretion" to modify an injunction in the face of changed circumstances or new facts. *See A&M Records, Inc. v. Napster, Inc.*, 284 F.3d 1091, 1098 (9th Cir. 2002) (quoting *Sys. Fed'n No. 91 v. Wright*, 364 U.S. 642, 647–48 (1961)).

A preliminary injunction is "an extraordinary remedy never awarded as of right." *Garcia v. Google, Inc.*, 786 F.3d 733, 740 (9th Cir. 2015) (citing *Winter v. Nat'l Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008)). To obtain such relief, a party must "make a showing" on each of the following elements: (1) that the party will suffer irreparable harm in the absence of preliminary relief; (2) that the balance of the equities tips in favor of granting an injunction; (3) that granting an injunction is in the public interest; and (4) that the party is likely to succeed on the merits. *All. for the Wild Rockies v. Cottrell*, 632 F.3d 1127, 1134–35 (9th Cir. 2011). What is required to "make a showing" on the fourth element depends on the strength of the party's showing on the first three. *Id.* Thus, if a party shows that it will suffer irreparable harm, that the balance of equities tips in its favor, and that granting an injunction is in the public interest, then the party need only show that there are "serious questions on the merits." *Id.*

//

1          1.  Likelihood of Success on the Merits

2          Plaintiff has demonstrated that there are at least serious questions on the merits. *See All.*

3  *for the Wild Rockies*, 632 F.2d at 1134–35. Plaintiff relies on two theories in support of its

4  motion. (Dkt. No. 11 at 11.) The first is that Defendant "methodically stole [Plaintiff's]

5  confidential information and trade secrets over the course of six weeks before quitting" and

6  accessed Plaintiff's Salesforce database without authorization. (*Id.*; Dkt. No. 45 at 10.) The

7  second is that Defendant "breached her non-compete and non-solicit obligations under the

8  Agreement by going to work for a competitor and soliciting [Plaintiff's] referral sources." (*Id.*;

9  Dkt. No. 11 at 11.)

10              *i.  Trade Secret Theft*

11         A trade secret is "information, including a formula, pattern, compilation, program,

12 device, method, technique, or process" that "[d]erives independent economic value, actual or

13 potential, not being generally known to, and not being readily ascertainable by proper means by,

14 other persons who can obtain economic value from its own disclosure or use" and "[i]s a subject

15 of efforts that are reasonable under the circumstances to maintain its secrecy."[2] Wash. Rev. Code

16 § 19.108.010(4)(a)–(b). Under Washington law, a key consideration in determining whether

17 information has "independent economic value" is the effort and expense required to develop it.

18 *See Ed Nowogroski Ins., Inc. v. Rucker*, 971 P.2d 936 (Wash. 1999). Customer reports and

19 information may rise to the level of a trade secret in certain contexts. *See, e.g.*, *id.* at 943 ("A

20 customer list is one of the types of information which can be a protected trade secret if it meets

21 the criteria of the Trade Secrets Act."); *Earthbound Corp. v. MiTek USA, Inc.*, Case No. C16-

22

23 ─────────────────
24 [2] The Court has jurisdiction over this matter and applies Washington law because Defendant's
   employment agreement contained the following provision: "This Agreement will be construed
25 under the laws of the State of Washington, without reference to is [*sic*] conflicts of laws
   provisions. Venue and jurisdiction for any action . . . shall be exclusively in an appropriate state
26 court located in King County, State of Washington or the United States District Court, Western
   District of Washington." (Dkt. No. 13-2 at 5.)

1150-RSM, Dkt. No. 46 at 19 (W.D. Wash. 2016) (finding that "detailed information about [the plaintiff's] current and prospective customers . . . constitute trade secrets under the UTSA").

Misappropriation means "[d]isclosure or use of a trade secret of another without express or implied consent by a person who . . . at the time of disclosure or use, knew or had reason to know that his or her knowledge of the trade secret was . . . (B) acquired under circumstances giving rise to a duty to maintain its secrecy or limit its use." Wash. Rev. Code § 19.108.010(2)(b)(ii)(B). Thus, misappropriation requires proof of improper acquisition, disclosure, or use. *See* Wash. Rev. Code § 19.108.010(2). Under Washington's Uniform Trade Secret Act, a plaintiff seeking to establish a claim of trade secret misappropriation has the burden of proving that legally protectable secrets exist. *See Ed Nowogroski Ins., Inc.*, 971 P.2d at 942; *Boeing Co. v. Sierracin Corp.*, 738 P.2d 665, 674 (Wash. 1987).

Washington courts have recognized that trade secrets may contain elements that individually exist in the public domain but qualify as trade secrets when taken as a whole. *See Boeing Co.*, 738 P.2d at 675. However, general assertions of alleged trade secrets are insufficient to establish grounds for injunctive relief, particularly when contradicted by counter-affidavits. *See K-2 Ski Co. v. Head Ski Co.*, 467 F.2d 1087, 1088–89 (9th Cir. 1972). As such, "whether a customer list is protected as a trade secret depends on three factual inquiries: (1) whether the list is a compilation of information; (2) whether it is valuable because it is unknown to others; and (3) whether the owner has made reasonable attempts to keep the information secret." *Ed Nowogroski Ins., Inc.*, 971 P.2d at 944.

Here, the parties apparently do not dispute whether the documents and reports constitute a compilation of information. (*See* Dkt. Nos. 1-5 at 7, 31 at 10.) Thus, the Court's analysis focuses on whether the documents and reports are valuable because they are unknown to others and whether Plaintiff has made reasonable attempts to keep them secret. *See Ed Nowogroski Ins., Inc.*, 971 P.2d at 944.

//

ORDER
C20-1028-JCC
PAGE - 7

In this case, Plaintiff alleges that Defendant "systematically gathered numerous documents," including Plaintiff's "customer lead reports, sales training materials, marketing materials, and other confidential, proprietary and trade secret information." (*See* Dkt. No. 1-5 at 7.) Plaintiff alleges that the stolen documents are valuable because they (1) are "not readily ascertainable from another source," (2) are "the product of relationships that were established over time and at considerable expense," (3) "identify [Plaintiff's] current and potential customers and referral sources," and (4) "include information showing where they are in the referral process, what remains to be done, and notes about progress or sales issues." (Dkt. No. 11 at 12.) Regardless of whether Defendant retrieved this information from the Salesforce database or her company email, both systems are password-protected and limited to specific employees. (Dkt. Nos. 11 at 13; 45 at 2, 7, 10.) Thus, Plaintiff has demonstrated that the documents are valuable because they are not generally known and that it has taken reasonable steps to keep them confidential.

Defendant does not deny that she sent these documents and reports to her personal email; instead, she asserts that the documents and reports "do not contain any non-public information" about Plaintiff's current customers or referral sources. (Dkt. No. 31 at 10.) But the reports are compilations of customer and business information that are otherwise not publicly accessible and therefore they may qualify as trade secrets. *See Boeing Co.*, 738 P.2d at 674; (Dkt. No. 11 at 13). Thus, although there may be public information in the reports, Defendant has not established that they cannot qualify as trade secrets.

Moreover, Defendant's argument is seriously undermined by the fact that she allegedly accessed Plaintiff's Salesforce database 11 times after ending her employment—four of those taking place after she began working for Plaintiff's direct competitor—and forwarded one of Plaintiff's lead sourcing reports to her new employer on the day she was served with the summons and complaint in this action. (Dkt. Nos. 45 at 2, 50 at 2.) As a threshold matter, Plaintiff's use of a password-protected database evidences its reasonable attempts to keep its

materials confidential. Also, Defendant's decisions to access Plaintiff's database while employed by Plaintiff's direct competitor and to send a lead sourcing report to the competitor are relevant to the question of whether she misappropriated Plaintiff's purported trade secrets. This is particularly true where Defendant's claim that "she disclosed [the customer lead report] because she was dumbfounded that [Plaintiff] is taking the position that the reports are trade secrets," (Dkt. No. 56 at 4), is belied by her omission of that fact in her email to her new employer, (*see* Dkt. No. 50 at 2). Thus, Defendant's actions after leaving Plaintiff's employment demonstrate both Plaintiff's reasonable attempts to keep its materials confidential and Defendant's attempts to circumvent those attempts.

Defendant also claims that she emailed herself these reports to verify the accuracy of her commission payments. (*See* Dkt. No. 31 at 6–7.) But Defendant's argument, even if credited by the Court, does not explain why Defendant also took (1) training materials that discuss Plaintiff's strategies for increasing referrals, leads, and customer move-ins; (2) sales and marketing documents, pitch checklists for certain services, and marketing tips and cheat sheets; and (3) a report detailing quota progress for Defendant's team in Texas. (Dkt. Nos. 11 at 14, 18 at 2–4.) Further, it does not explain Defendant's decision to send a customer lead report to her new employer on the same day she was served with the summons and complaint. As discussed above, Plaintiff has established that the documents at issue derive value from being kept secret, that Plaintiff took reasonable efforts to maintain their secrecy, and that Defendant circumvented those reasonable efforts when she sent the documents to herself. Defendant's alleged intent in sending the documents to herself does not strip the documents of trade secret protection or excuse Defendant's decision to send the reports to her new employer.

Finally, Defendant denies that she was ever told the reports were confidential. (Dkt. No. 31 at 10.) In support of her argument, Defendant points to the fact that Plaintiff "mass emailed the reports as attachments on a company email listserv." (Dkt. No. 11 at 10.) But, again, the documents were valuable because they were secret, and Plaintiff took reasonable steps in

1  maintaining that secrecy. The fact that Plaintiff distributed those documents to its own

2  employees does not demonstrate that the documents could therefore be shared with the public or

3  with Plaintiff's direct competitors. (*Id.* at 12–13.)

4         Thus, Plaintiff has established serious questions on the merits of its claim that Defendant

5  misappropriated Plaintiff's protectible trade secrets when she emailed documents and reports to

6  herself prior to resigning and when she accessed Plaintiff's Salesforce database without

7  authorization. See *Cottrell*, 632 F.3d at 1134–35.

8                  *ii.   Violations of the Employment Agreement*

9         Plaintiff also claims that Defendant breached the non-compete and non-solicit clauses of

10  her employment agreement by accepting employment with Plaintiff's direct competitor and by

11  engaging Plaintiff's customers. Each allegation is discussed in turn.

12                  a.   <u>Non-Compete Clause</u>

13         In Washington, non-compete agreements are presumptively unenforceable unless they

14  satisfy three statutory requirements. *See* Wash. Rev. Code. § 49.62.020. First, the terms of the

15  non-compete agreement must be disclosed no later than when the offer is accepted. Wash. Rev.

16  Code § 49.62.020(1)(a)(i). Second, the employee's earnings must exceed $100,000 per year.

17  Wash. Rev. Code § 49.62.020(1)(b). Third, the employee cannot have been laid off. Wash. Rev.

18  Code § 49.62.020(1)(c).

19         Even if these requirements are satisfied, the court must still consider whether enforcing

20  the non-compete agreement is reasonable. *Wood v. May*, 438 P.2d 587, 590 (1968). "The

21  determination of whether a covenant is reasonable is a question of law." *Emerick v. Cardiac*

22  *Study Ctr., Inc., P.S.*, 357 P.3d 696, 701 (Wash. Ct. App. 2015) (citing *Alexander & Alexander,*

23  *Inc. v. Wohlman*, 578 P.2d 530, 538 (Wash. Ct. App. 1978)). To determine reasonableness, the

24  court considers (1) whether the restraint is necessary to protect the employer's business, (2)

25  whether it imposes on the employee any greater restraint than is reasonably necessary to secure

26  the employer's interests, and (3) whether enforcing the covenant would offend public policy. *See*

ORDER
C20-1028-JCC
PAGE - 10

*id.* at 701.

### 1. Statutory Requirements

Here, the parties agree that the second and third requirements of Wash. Rev. Code § 49.62.020 are satisfied, but dispute whether the first requirement is met. (*See* Dkt. Nos. 11 at 15, 31 at 13–14.) Defendant claims she received and accepted a verbal offer on June 18, 2015. (Dkt. No. 31 at 14.) When the alleged verbal offer was extended, the regional sales director purportedly told Defendant that Plaintiff "would not require her to sign a noncompete and then pressured [Defendant] to give notice at her current employer." (Dkt. Nos. 28-1 at 3–4; 31 at 14.)

The Court makes no finding as to whether a verbal offer was in fact extended because any verbal offer would have been superseded by the terms of the written job offer. *See A Place for Mom, Inc. v. Leonhardt*, Case No. C06-0457-MJP, Dkt. No. 52 at 3 (W.D. Wash. 2006) ("Defendant's argument that the non-compete agreement is not supported by consideration as it was not revealed to him until after he had accepted Plaintiff's job offer is completely contradicted by the fact that he signed the Agreement on the same day that he signed the acceptance of the job offer (which also stated that employment was contingent on him signing the non-compete agreement)."). Furthermore, the record demonstrates that Plaintiff's job offer process did not begin until June 19, 2015, and that Defendant signed the non-compete agreement when she officially accepted Plaintiff's offer of employment on June 21, 2015. (*See* Dkt. Nos. 12 at 3; 13 at 3; 13-1; 13-2; 45 at 4); (*see also* Dkt. No. 49-5 at 2) (in an email dated June 22, 2015, Defendant stated that she "officially accepted and returned all documents to HR yesterday evening"). Thus, the record establishes that Plaintiff's non-compete agreement was provided at the time Defendant accepted Plaintiff's offer of employment. Therefore, the non-compete agreement complies with the requirements set forth in Wash. Rev. Code. § 49.62.020.

### 2. Reasonableness

Having determined that the non-compete clause is valid under the statute, the Court now turns to whether enforcing Plaintiff's non-compete agreement is reasonable using a three-prong

1    test: necessity, scope, and public policy. *See Emerick*, 357 P.3d at 701.

2                                          *a.   Necessity*

3          First, the Court considers whether the restraint is necessary to protect Plaintiff's business.

4    *See id.* "Washington provides broad protection to tangible and intangible business interests and

5    goodwill." *Amazon.com, Inc. v. Moyer*, 417 F. Supp. 3d 1388, 1396 (W.D. Wash. 2019) (citing

6    *Oberto Sausage Co. v. JBS S.A.*, Case No. C10-2033-RSL, Dkt. No. 36 at 9 (W.D. Wash. 2011))

7    (noting that employer not only "has a legitimate interest in protecting its confidential

8    information" but also "in avoiding unfair competition" based upon confidential information

9    learned during the scope of employment); *Knight, Vale & Gregory v. McDaniel*, 680 P.2d 448,

10    452 (Wash. Ct. App. 1984) (employer had "legitimate business interest in maintaining [its] large

11    and profitable clientele" especially where employee had gained "extensive, valuable knowledge

12    of the clients' business and internal operations and develop[ed] a close, familiar working

13    relationship with the client"); *Nw. Mobile Servs., L.L.C. v. Schryver Med. Sales & Mktg., Inc.*,

14    Case No. C06-5227-RBL, Dkt. No. 25 at 3 (W.D. Wash. 2006) (noting "protectable interests

15    include customer lists and relationships")). In other words, "the law in Washington is clear that

16    an employer has a legitimate interest in protecting its existing client base and in prohibiting the

17    employee from taking its clients." *Emerick*, 357 P.3d at 722 (internal citations and quotation

18    marks omitted). Therefore, to show necessity, a plaintiff must demonstrate that a protectable

19    interest exists and that the defendant could pose a threat to that interest if not adequately

20    restrained. *See id.* at 723.

21          Here, Plaintiff has met its burden under the necessity prong. (*See* Dkt. No. 45 at 2.) By

22    the nature of her position, Defendant necessarily became familiar with Plaintiff's customers,

23    referral sources, training materials, and sales and marketing strategies. (Dkt. No. 11 at 2.) But

24    even setting aside the nature of Defendant's work, the necessity of the non-compete is further

25    demonstrated by the ways that Defendant has unjustly harmed Plaintiff's legitimate interests

26    after leaving to work for Plaintiff's competitor. Plaintiff required Defendant to sign a

noncompete because Plaintiff feared that if Defendant left for a competitor, Defendant would be able to use the information she learned while working with Plaintiff to harm Plaintiff's business. That fear was apparently warranted. For when Defendant left to work for Plaintiff's direct competitor, she sent herself confidential documents and reports, improperly accessed Plaintiff's Salesforce database, and provided sensitive information to her new employer.

Moreover, Plaintiff has presented evidence that it has in fact lost at least one referral source and that Defendant solicited at least 20 more. (Dkt. No. 49-1 at 5.) Thus, there is evidence that Defendant impermissibly interfered with Plaintiff's legitimate business interests and that Plaintiff has suffered actual competition or damages resulting therefrom. *See Emerick*, 357 P.3d at 723. Therefore, the Court has little difficulty finding that the non-compete agreement is necessary to protect Plaintiff's business interests. *See Nw. Mobile Servs., L.L.C.*, Case No. C06-5227-RBL, Dkt. No. 25 at 3.

### b.  Scope

Next, the Court determines whether the non-compete "imposes on the employee any greater restraint than is reasonably necessary to secure the employer's interests." *Emerick*, 357 P.3d at 701. The Court's inquiry is guided by the scope of the non-compete as drafted. *See id.* (considering the reasonableness "of the noncompete covenant as written as opposed to whether and how much the employer experiences actual harm and competition").

The Court reviews both the duration and geographic limitation of the non-compete agreement. First, the duration of the agreement is 12 months, which complies with Wash. Rev. Code § 49.62.020. However, Defendant claims that the duration is nonetheless unreasonable and excessive because the "information [in the lead reports] is stale because, due to the nature of the industry, [Plaintiff] is generally able to place a family in a home in approximately one month." (Dkt. Nos. 28-1 at 5–6, 31 at 11.) While this may be the case, Defendant fails to acknowledge that referral sources do not become stale once a family is placed in a facility. Defendant herself describes referral sources as "discharge managers, care workers, social workers, and other

employees at hospitals, rehabilitation, and other healthcare providers." (Dkt. No. 31 at 19.) Thus, relationships with referral sources represent a valuable and ongoing source of business for Plaintiff, and their value supports the reasonableness of the current agreement.

Next, Defendant agreed to refrain from "directly or indirectly work[ing] on any products or services that could be used as a substitute for any products or services being commercially developed or exploited by [Plaintiff] during the last 24 months of [Defendant's] employment with [Plaintiff] and either (a) about which I learned Proprietary Information or (b) on which I worked." (Dkt. No. 13-2 at 4.) Notably, Plaintiff seeks to enforce this provision for the entire state of Texas. (Dkt. No. 11-1 at 5.) Yet when Defendant resigned, she was "responsible for managing 37 of [Plaintiff's] referral accounts in the greater Dallas/Fort Worth area." (Dkt. No. 11 at 7.)

The Court finds that under the facts presented Plaintiff is entitled to injunctive relief in the Dallas and Fort Worth markets because, since Defendant left the company, "Plaintiff does not have a local Healthcare Account Executive currently in Dallas/Fort Worth." (Dkt. No. 45 at 12.) And, according to Plaintiff, "[w]ithout a local presence in that market, [Plaintiff] is particularly vulnerable to [Defendant's] improper solicitation of [Plaintiff's] customers and referral sources." (*Id.*) Given Defendant's discrete and identifiable sales territories, prohibiting her from working anywhere in Texas as opposed to those territories alone is essentially "a general restriction on competition, not a reasonable restriction on unfair competition." *Amazon.com, Inc.*, 417 F. Supp. 3d at 1398.

Finally, because Defendant is based in Texas, restraining her ability to work anywhere in that state is likely to burden her ability to earn a livelihood in excess of what is necessary to protect Plaintiff's legitimate business interests. *See Wood*, 438 P.2d at 590 (affirming decision to not enforce a non-compete as written because it encompassed 22 counties and thus "was both unduly harsh . . . in curtailing [the defendant's] legitimate efforts to earn a livelihood and unnecessary for the protection of the legitimate interests of [the defendant's former employer].").

1  Thus, Plaintiff has established serious questions going to the merits as to the enforceability of the

2  non-compete agreement within the Dallas and Fort Worth areas. The parties may address

3  whether the non-compete agreement is enforceable beyond that area when litigating the merits of

4  Plaintiff's claims based on the non-compete agreement.

5  *c.   Public Policy*

6  Finally, the Court determines whether enforcing the non-compete agreement would

7  offend public policy. *See Emerick*, 357 P.3d at 701. On this issue, although Plaintiff does operate

8  within the "service" industry in some sense, "it is also unquestionably a profit-seeking business

9  enterprise" and "the public interest is not implicated in any significant way in the dispute

10  between these parties." *Leonhardt*, Case No. C06-457-MJP, Dkt. No. 52 at 7. Thus, precluding

11  Defendant from competing with Plaintiff's business interests is not likely to offend public policy.

12  In sum, the non-compete agreement complies with statutory and common law

13  requirements. *See* Wash. Rev. Code. § 49.62.020; *Emerick*, 357 P.3d at 701. Thus, Plaintiff has

14  identified serious questions going to the merits of its claim that Defendant has breached her non-

15  compete agreement.

16  b.   Non-Solicitation Clause

17  Next, the Court turns to Plaintiff's claim that Defendant has breached the non-solicitation

18  clause of her employment agreement. (Dkt. No 11 at 11.) In Washington, the non-compete

19  statute explicitly excludes non-solicitation agreements from its strict enforceability requirements.

20  *See* Wash. Rev. Code § 49.62.010(4). The statute defines a non-solicitation clause as "an

21  agreement between an employer and employee that prohibits solicitation by an employee, upon

22  termination of employment: (a) [o]f any employee of the employer to leave the employer; or (b)

23  of any customer of the employer to cease or reduce the extent to which it is doing business with

24  the employer." Wash. Rev. Code § 49.62.010(5).

25  Defendant raises two arguments against enforcement of the non-solicitation clause of her

26  employment agreement. First, Defendant claims that the non-solicitation clause is actually a non-

compete clause misleadingly captioned as a non-solicitation clause. (Dkt. No. 31 at 14.) But

Defendant's argument is wholly contradicted by both the unambiguous title of the section,

"**<u>Solicitation of Employees and Company Customers</u>**," and the fact that the non-solicitation

clause prohibits the exact conduct that is exempted from the requirements of Wash. Rev. Code §

49.62.020. *See* Wash. Rev. Code § 49.62.020(4), (5); (Dkt. No. 31 at 3–4). Thus, Defendant's

first argument fails.

Second, Defendant argues the non-solicitation clause is ambiguous and must therefore be

construed against Plaintiff. (Dkt. No. 31 at 18.) The ambiguity allegedly hinges on whether

"referral groups ('Company Customers') *and their representatives*" encompasses "referral

sources." (*Id.* at 17–18) (emphasis added). Specifically, Defendant argues that individuals

("discharge managers, care workers, social workers, and other employees at hospitals") cannot

be classified as "referral groups," and therefore her conduct was not improper. (*Id.*) But

Defendant is simply creating ambiguity where the meaning is plain: Defendant agreed to not

solicit other employees or representatives of referral groups—*i.e.*, referral sources. (Dkt. No. 11

at 6.) Tellingly, at no point in her otherwise elaborate analysis does Defendant mention that the

language expressly includes "referral groups . . . and their representatives." (*See* Dkt. No. 31 at

17–19.) Yet this language is critical to understanding the intent of the parties, and its presence

assures the Court that the non-solicitation agreement is not ambiguous. Thus, Defendant's

second argument also fails. Therefore, as the non-solicitation clause of Defendant's employment

agreement falls within the statutory definition of non-solicit agreements and the record shows

that Defendant has in fact solicited Plaintiff's referral sources, Plaintiff has demonstrated a

serious question on the merits of its claim that Defendant breached the non-solicitation clause.

In sum, Plaintiff has demonstrated, at the very least, serious questions on the merits of its

trade secret misappropriation claim based on Defendant's alleged misappropriation of Plaintiff's

confidential documents and reports during and after her employment and on the merits of its

breach of contract claims based on Defendant's alleged employment by Plaintiff's direct

competitor and solicitation of Plaintiff's referral sources. *See Cottrell*, 632 F.2d at 1135.

### 2. Irreparable Harm

Next, to obtain a preliminary injunction, a plaintiff must show that it is likely to suffer irreparable harm in the absence of injunctive relief. *Winter*, 555 U.S. at 20. Defendant argues that Plaintiff has not demonstrated a likelihood of irreparable harm, pointing to five interdependent reasons. (*See* Dkt. No. 31 at 22–24.) Ultimately, none of Defendant's arguments are persuasive because "[t]he potential to lose customers, employees, goodwill, and revenue 'certainly support[s]' a finding of the possibility of irreparable harm." *Navigant Consulting, Inc. v. Milliman, Inc.*, Case No. C18-1154-JLR, Dkt. No. 15 at 7 (W.D. Wash. 2018) (quoting *Stuhlbarg Int'l Sales Co. v. John D. Brush & Co.*, 240 F.3d 832, 841 (9th Cir. 2001)). And here, Plaintiff has presented evidence that it has already lost one referral source due to Defendant's solicitation efforts and that Defendant has already received "nine patient referrals from at least four other [Plaintiff] referral sources she serviced." (Dkt. Nos. 11 at 18, 45 at 11.) Moreover, without a clear picture of all that was taken and what may still be in Defendant's possession, Plaintiff is unable to take effective steps to protect its business. *See Earthbound Corp.*, Case No. C16-1150-RSM, Dkt. No. 46 at 20. Thus, the Court concludes that Plaintiff has demonstrated a likelihood of irreparable harm that merits injunctive relief.

### 3. Balance of the Equities

A plaintiff must also show that the balance of equities tips in its favor. *Winter*, 555 U.S. at 20. Plaintiff has met that burden here. First, Defendant will not be unduly burdened by an injunction. *See, e.g.*, *Labriola*, 100 P.3d at 800 (J. Madsen, concurring) (noting that a non-compete agreement was unreasonable because it entirely barred the employee from working in his field of expertise even though he took no unfair advantage of his former employer). Indeed, Defendant may still work in similar, non-competing industries for the duration of any injunction. Thus, the terms of the preliminary injunction are not unduly burdensome to Defendant and reflect Plaintiff's need to secure a protectible interest pending the resolution of this case. *See*

*Leonhardt*, Case No. C06-0457-MJP, Dkt. No. 52 at 5 ("Plaintiff has the right to prevent Defendant from making use of any proprietary information he learned during his employment.").

Additionally, Defendant points to the size of Plaintiff's business and boldly suggests that "there is no evidence that any loss [Plaintiff] might sustain would be of note." (Dkt. No. 31 at 25.) However substantial Plaintiff's market share may be, it still does not excuse the harm Defendant has caused, and may continue to cause, absent injunctive relief. Therefore, the balance of equities tips in favor of Plaintiff.

### 4.  Public Interest

Lastly, a plaintiff must show that an injunction is in the public interest. *Winter*, 555 U.S. at 20. On balance, the public interest is benefitted through the enforcement of contractual provisions that aim to protect a company's investment in its development of trade secrets and customer relationships. *See Earthbound Corp.*, Case No. C16-1150-RSM, Dkt. No. 46 at 21 ("Theft of trade secrets, and allowing the thieves to retain and use the confidential information they purloined, undermines business development and stability; preventing such conduct is in the public's interest."). Thus, to the extent that the public interest is implicated in this case, it would be furthered by an injunction restricting Defendant from continuing to use the trade secrets she allegedly misappropriated.

In sum, Plaintiff has demonstrated serious questions going to the merits of the case, that it will suffer irreparable harm absent an injunction, that the balance of equities tips in its favor, and that granting an injunction is in the public interest. Therefore, a preliminary injunction is appropriate in this case. *See Cottrell*, 632 F.3d at 1134–35.

### B.   Defendant's Surreply

On July 28, 2020, the Court granted Defendant leave to file a surreply to address arguments Plaintiff raised in its reply brief. (Dkt. No. 53.) Defendant filed its surreply on July 29, 2020, (Dkt. No. 56), and Plaintiff responded to the surreply on July 30, 2020, (Dkt. No. 59).

Defendant first argues that Plaintiff improperly withheld discovery materials regarding

1   Defendant's post-resignation access of Plaintiff's Salesforce database and that Plaintiff has not

2   demonstrated that the Salesforce database is a trade secret Defendant could have

3   misappropriated. (Dkt. No. 56 at 2.) But Defendant's discovery requests sought documents

4   related to "computer forensic work, investigation, examination, or analysis." (*See* Dkt. No. 59 at

5   3.) No such investigation occurred here. Rather, Plaintiff was not notified of the need to check

6   the login history of its Salesforce database until Defendant disclosed her unauthorized access in

7   her July 24, 2020 discovery responses. (*See id.* at 2–3.) And, contrary to Defendant's assertion,

8   her unauthorized access of the Salesforce database may constitute an improper acquisition of the

9   material therein, regardless of whether she downloaded or exported material. *See* Wash. Rev.

10  Code § 19.108.010(2); (Dkt. No. 56 at 2.) Thus, Defendant's unauthorized access of Plaintiff's

11  Salesforce database may in fact be a viable ground for Plaintiff's trade secret misappropriation

12  claims. Moreover, Plaintiff raised this argument as soon as was practicable following

13  Defendant's discovery disclosures, and any minimal prejudice Defendant may have suffered

14  from arguments arising from her disclosures was obviated by her opportunity to respond in her

15  her surreply.

16       Next, Defendant argues that Plaintiff has not sufficiently shown that Defendant

17  committed a crime under Texas law. (*See* Dkt. No. 56 at 2–3.) Defendant's argument is

18  irrelevant because Plaintiff is not bringing any claim against Defendant arising under the cited

19  provisions of Texas law. (*See generally* Dkt. Nos. 1-5, 11.)

20       Defendant next contends that Plaintiff has miscited several cases concerning whether

21  under Washington law an unenforceable provision of a contract may be stricken and the

22  remainder of the contract enforced. (*See* Dkt. No. 56 at 3.) But the question before the Court is

23  whether Plaintiff has demonstrated its need for injunctive relief, including whether serious

24  questions exist on the merits of its contractual claims against Defendant, not whether the Court

25  can enforce the agreements themselves "as to time and area" or otherwise reform the contracts.

26  (*See id.*) And, as discussed above, Plaintiff has provided sufficient evidence to raise serious

1    questions on the merits of Defendant's breach of her employment agreement, including the non-

2    compete and non-solicitation clauses. *See supra* Section II.A.1.

3          Defendant also argues that Plaintiff has not established that its customer lead reports

4    constitute protectible trade secrets or, if they do, that Plaintiff has now waived that protection by

5    publicly filing that information. (*See* Dkt. No. 56 at 3–4.) But, contrary to Defendant's claim,

6    Plaintiff has sufficiently identified the confidential information it alleges Defendant is using to

7    unfairly compete with Plaintiff. *See* supra Section II.A.1.i. And Defendant has failed to establish

8    that Plaintiff has in fact waived any trade secret protections it is entitled to via its public filings in

9    this case. Therefore, the Court remains satisfied that Plaintiff has established serious questions

10   going to the merits of its trade secret claims. *See supra* Section II.A.1.i.

11         **C.      Security**

12         "The court may issue a preliminary injunction or a temporary restraining order only if the

13   movant gives security in an amount that the court considers proper to pay the costs and damages

14   sustained by any party found to have been wrongfully enjoined or restrained." Fed. R. Civ. P.

15   65(c). "Despite [this] seemingly mandatory language, Rule 65(c) invests the district court with

16   discretion as to the amount of security required, *if any*." *Johnson v. Couturier*, 572 F.3d 1067,

17   1086 (9th Cir. 2009) (internal quotations omitted).

18         Here, Plaintiff previously posted a bond of $40,000 with the King County Superior

19   following that court's issuance of the temporary restraining order. (*See* Dkt. Nos. 1-2 at 5, 5-1 at

20   196–99; *see also* Dkt. No. 13-2 at 5) (agreement's injunctive relief, stating, "I agree that the

21   company will be entitled to seek extraordinary relief in court, including . . . preliminary

22   injunctions . . . without the necessity of posting a bond or other security"). Given Plaintiff's

23   posting of a bond with the King County Superior Court and its strong showings on each of the

24   elements necessary to obtain a preliminary injunction, *see supra* Sections II.A.1–4., the Court

25   exercises its discretion and declines to require Plaintiff to post an additional bond.

26         //

D.      **Plaintiff's Motions to Seal**

Plaintiff moves to maintain under seal several exhibits submitted in support of its motion for a preliminary injunction. (Dkt. Nos. 14, 48.) Defendant does not oppose the motions. (*See* Dkt. Nos. 14 at 2, 48 at 2.)

"There is a strong presumption of public access to the court's files." W.D. Wash. Local Civ. R. 5(g). This presumption applies particularly to "dispositive pleadings," which includes exhibits attached to such pleadings. *Kamakana v. City & County of Honolulu*, 447 F.3d 1172, 1179 (9th Cir. 2006). To overcome this presumption, there must be a "compelling reason" for sealing that is "sufficient to outweigh the public's interest in disclosure." *Id.*; *see Center for Auto Safety v. Chrysler Group, LLP*, 809 F.3d 1092, 1101–03 (9th Cir. 2016) (concluding that compelling reason standard applied to request to seal documents filed in support of motion for preliminary injunction). "[T]he 'compelling reasons' standard does not require the court to find an infringement of trade secrets if the material at issue is disclosed. Rather, it only requires that disclosure 'might become a vehicle for improper purposes,' including the 'release of trade secrets.'" *PTP OneClick, LLC v. Avalara, Inc.*, Case No. C19-0640-JLR, Dkt. No. 87 at 8 (W.D. Wash. 2019) (quoting *Kamakana*, 447 F.3d at 1179)).

Here, the exhibits at issue contain Plaintiff's purported trade secrets, the disclosure of which could cause Plaintiff substantial economic and competitive harm. (*See* Dkt. Nos. 14 at 1, 5; 18 at 4–5; 48 at 2, 4–5.) Thus, maintaining the exhibits under seal is necessary to prevent the Court's files from being used for an improper purpose and to avoid the irreparable harm to Plaintiff discussed above. *See PTP OneClick, LLC*, Case No. C19-0640-JLR, Dkt. No. 87 at 8; *supra* Section II.A.1.ii. Accordingly, the Court finds that Plaintiff has demonstrated compelling reasons to maintain the exhibits under seal and GRANTS Plaintiff's motions to seal (Dkt. Nos. 14, 48).

III.    **CONCLUSION**

For the foregoing reasons, the Court hereby GRANTS Plaintiff's motion for a

preliminary injunction (Dkt. No. 11) and GRANTS Plaintiff's motions to seal (Dkt. No. 14, 48). The Court FINDS that Plaintiff is not required to post an additional bond. The Clerk is DIRECTED to maintain Docket Numbers 16, 17, 19, 20, 21, 22, 23, 50, and 51 under seal until further order of the Court. Defendant is hereby ORDERED to refrain from the following:

(1) Using or disclosing any of Plaintiff's confidential information and trade secrets;

(2) Performing lead generation, customer referrals, or any other senior living and care referral services in Dallas and Fort Worth; and

(3) Soliciting, attempting to solicit, or contacting for purposes of providing senior living and care referral services, any referral sources or current or potential customers of Plaintiff.

DATED this 31st day of July 2020.

John C. Coughenour
UNITED STATES DISTRICT JUDGE